**COMMERCIAL STANDARD INSURANCE COMPANY, Appellant,**

v.

**Sammie J. WASHINGTON, Appellee.**

**No. 11356.**

Court of Civil Appeals of Texas.

Austin.

Feb. 2, 1966.

Rehearing Denied Feb. 23, 1966.

McKay & Avery, Charlie D. Dye, Austin, for appellant.

Jack Garey, Austin, for appellee.

HUGHES, Justice.

This is a Workmen's Compensation case in which the employe, Sammie J. Washington, recovered a judgment against the insurance carrier, Commercial Standard Insurance Company, awarding him benefits for total permanent incapacity.

Appellant's first four points, jointly briefed, are to the effect that there is no evidence in the record to support the jury finding that appellee sustained total permanent incapacity.

We overrule these points. The evidence to sustain this finding is substantially as follows:

Appellee is 54 years of age. He cannot read or write, except to sign his name. He is a common laborer. When injured, he was working for Archie C. Fitzgerald in the construction of a new bank building in South Austin, Texas. He was stripping forms where concrete had been poured for a ceiling and " * * * was prizing backwards with a wrecking bar, and I felt a little snap where it snapped in my back." He had been standing on a scaffold and was working in a stooped over position. He rested for a few minutes and then went back to work. His condition became worse as the day progressed and by the next day his back was "sure enough sore."

The next day he went to a Doctor Stephenson in Smithville, Texas, his family doctor. Dr. Stephenson gave him a shot in the arm and informed him that "it was just a nerve." Later that evening the pain became so great that his family brought him from his home to Brackenridge Hospital in Austin. His wife then called at the office of Fitzgerald and Dr. Warran A. Ross was sent to the hospital to examine and treat him. Appellee was placed in traction, but was later advised that an operation would be necessary. On June 9, 1964, an operation was performed by Dr. Warran Ross and a portion of two discs in the lower portion of appellee's back was removed. After removing the discs the spine was visibly unstable and a spinal fusion was performed. Appellee remained in the hospital about five days thereafter. Dr. Ross cared for and treated him from May 29, 1964 up to "the present." Trial commenced in this cause March 8, 1965.

A back brace was prescribed. For a period of six months from the date of operation, June 9, appellee had been instructed by Dr. Ross to refrain from any activity other than normal walking and sitting. This type instruction is a customary one made by Dr. Ross with reference to the type of operation performed on appellee. It has been Dr. Ross' experience that at least six months is required to allow "maximum opportunity for disc bone to become solid." X-ray pictures had been taken of appellee's back as late as March 4, 1965, and by examination of the x-rays it was apparent to Dr. Ross that the bone was progressing as he had anticipated.

Dr. Ross testified that following the first six months' period, an additional six months is required for the new bone (used in connection with the spinal fusion) to become more mature and stronger, and in a year's time following surgery the new bone has reached as much strength as it is going to reach. During the second six-month period appellee was instructed to perform muscle building exercises to increase the mobility of his spine and build up muscle strength to support the spine. At the time of trial appellee was in the second six-month period. At the time of trial, appellee was nine months from surgery and there would be an additional three months, or to June 1965, until the second six-month period had transpired.

Appellee testified:

"Q Now, as I understand, Dr. Ross hasn't released you to go back to any kind of work at the present time?

A No, sir.

Q Has he indicated to you whether or not you will go back to any type of activity, work activity in the future?

A No, sir, he hasn't said.

Q Well, has he told you there would be any period of time involved in which you would have to wait before he

would know what the situation would be?

A He said it would be three more months.

Q Before he would know?

A Before he could go into it."

Appellee understood that a period of one year following the operation would be required before he would be released by Dr. Ross to try any kind of work. At the time of trial he was being treated by Dr. Ross. He had not been informed by Dr. Ross what type of work he would be able to perform after being released from treatment, but had been informed that after another three months Dr. Ross would inform him what he would be able "to start into."

Appellee was satisfied with the way in which Dr. Ross had been treating him and felt as if he was progressing from that treatment. He testified:

"Q You indicated that Dr. Ross in about three months will tell you what you can do or not do. I believe I asked you once before in the deposition, but so the members of the jury will have it, you are going to rely on Dr. Ross' opinion as to what you can do or can't do, aren't you, sir?

A Yes, sir.

Q And are going to rely on his opinion as to what you should or should not do?

A Yes, sir.

Q And also on his opinion as to what you should try to do?

A Yes, sir."

Since his operation appellee has not tried to do any work. Appellee testified that he did not "believe" he would be able to do construction work, but testified that he would try to perform whatever work Dr. Ross suggested to him.

The rehabilitation of appellee's back would be completed in June 1965, at which time, in the opinion of Dr. Ross, he would have received maximum medical benefit. It was the further opinion of Dr. Ross that at the conclusion of one year's time, appellee would be able to return to some type of work. Dr. Ross recommended that appellee not lift excessive weights. By this he put an arbitrary limit of 50 pounds to the waist and 10 pounds over the head. When asked to assume an average man with a normal back, Dr. Ross placed a limitation of not lifting more than 75 pounds to the waist level, saying all people have limitations.

Testifying specifically with reference to future incapacity of appellee, Dr. Ross testified as follows:

"Q * * * In your opinion, Doctor, you have had occasion to be familiar with various patients that have been connected with so-called Workmen's Compensation cases, which this is one. In your opinion, Doctor, is Mr. Washington so-called totally and permanently incapacitated from working?

A No, sir.

Q Doctor, in your opinion, is Mr. Washington and will he be in the future partially incapacitated to work?

A I believe so, yes, sir.

* * * * * *

Q Do you have an opinion, sir, with respect to whether or not there would be any period at all of total incapacity?

A Yes, from the time of surgery until a year after surgery, I anticipate and have instructed him not to do anything.

Q What is your opinion as to when the period of partial incapacity that you spoke of a moment ago will start?

A Well, it should start at that time, we have stated that as the 9th day of June of this year."

From a medical standpoint it was the opinion of Dr. Ross that an excellent result had been obtained in appellee's case. Dr. Ross further testified:

"Q In the case of Mr. Washington, based on your observation of him this period of time, would you say (he has) a good ambition to return to work?

A He appears to have, yes, sir.

Q Would you fully anticipate that he will in the future return to gainful occupation?

A Yes, sir."

And by return to a "gainful occupation," Dr. Ross understood that to mean "he was going back to do something for hire."

On cross examination, Dr. Ross was queried about his testimony that appellee was not totally and permanently incapacitated from working and we quote his testimony in this respect:

"Q Now, I would like to ask you to assume that the term (total incapacity) defines or means the ability of a person or a worker to do the usual and customary tasks of a workman in such a way as to be able to get and keep a job, and I will ask you to further assume that in connection with the usual and customary tasks of a workman that there would be an occasion from time to time to lift weights of more than 50 pounds above the waist and there would be occasions from time to time to lift more than 10 pounds of weight above the shoulders. Now, using that definition for total incapacity, after the year or year and a half or whatever it is when Sammie Washington reaches this period of—reaches the state of maximum, I believe you said the maximum medical benefit that he will receive, and assuming that everything goes just fine, with that definition, will you state whether or not, assuming that definition and assuming those tasks, will you state whether or not in your opinion if Sammie Washington follows your recommendations and advice he would be totally incapacitated?

Q Doctor, do you understand what I asked you. If you have got any question, I want to be sure we get this point just exactly clear and right. In other words, using the definition. I gave you of total incapacity, if Sammie Washington follows your recommendations, state whether or not after a period of a year or a year and a half he will or will not be totally incapacitated, permanently?

A Well, it requires two answers. One would be the fact that I would not recommend that he did these things, of excess weights, and assuming then—

Q Well, just—

MR. DYE: Wait just a minute, Your Honor. Let him finish his answer.

MR. GAREY: I gave you the weights, Doctor. More than 50 pounds above the waist and more than 10 pounds above the shoulder, so we won't talk in generalities, and I don't want— I want to talk specifically, assuming that the job from time to time will require that, under your recommendations will he or will he not be able to do that work?

A Well, under my recommendations, then, he would be incapacitated, using that definition.

Q Using that definition he would be totally incapacitated?

A Totally incapacitated.

Q To do that work?

A Yes, sir."

Dr. Ross who was the doctor furnished appellee by appellant and whose skill and qualifications as a doctor are unquestioned

testified that appellee should never engage in any type of work which would require him to lift more than ten pounds weight above his shoulder or fifty pounds above his waist or in work which would require prolonged bending or twisting the body or work which required a strained position of squatting or stooping or which would place him in a strained position for long periods.

Dr. Ross further testified that appellee has some loss of equilibrium which could cause difficulty in walking on rocks or rough terrain.

Dr. Ross testified that the greatest flexibility in the spine, below the neck, was found in the sacrum or lowest lumbar joint in the spine; that about fifty per cent of the motion in the lumbar spine is at the fourth and fifth vertebrae where the spinal fusion was performed by him on appellee. With respect to the effect of this fusion on appellee, we quote Dr. Ross:

"Q So that those two vertebrae that were fused or made immobile is where we would normally have in a back that was unfused the 50 per cent of your side bending and lateral motion as well as your forward and backward motion; is that correct?

A Yes, sir.

Q And if I understand you correctly, if your operation was a success, then that particular mobility of the spine is forever lost?

A That is correct.

Q That is a permanent condition, of course?

A That is correct.

Q That is, hopefully, it is permanent?

A Yes, sir, if it stays solid, yes, sir."

Dr. Ross testified at some length to the impairment which appellee would have as a result of the spinal fusion in his physical agility; that he would be awkward; that activity would require use of normally unused or little used muscles; that he would tire easily; that he could not stand for more than three to five hours. He also testified that as a result of the fusion of the lower lumbar vertebrae the point of greatest stress in the lumbar spine is shifted to higher and weaker portions of the spine. With respect to the fusion, if successful, Dr. Ross stated that "It is not a real rigid piece of bone," and that "repeated stress applied to this bone can cause it to break," and that it is too early to say that appellee has a strong, solid fusion that would withstand heavy strain or heavy lifting.

The trial court gave to the jury the accepted definition of "total incapacity" and no objection to it was made. "Total incapacity" does not mean an absolute disability to perform any kind of labor, but a person who is incapacitated to such an extent that he is unable to procure and retain employment, doing the usual tasks of a workman.

This record suggests the difficulty which injured employees who perform manual labor have in obtaining employment of the same nature. Appellee is not equipped to do any work other than physical labor. It is suggested that he might work at a service station or that he might wash dishes. The record, however, shows that in performing these jobs, appellee would be required to do things which he either could not do or Dr. Ross has advised him not to do. It is also suggested that appellee might do work as a night watchman, but there is no evidence that such employment was available.

The test laid down by the court is a practical test. It is not chimerical. It is based on reality. What reasonable opportunity does this man have to obtain and hold the only kind of a job for which he is fitted? The jury said, in effect, "None." We whole-heartedly agree with the jury.

Appellant cites Texas Employers' Insurance Association v. Hawkins, 387 S.W.2d 469, Tex.Civ.App., Amarillo, writ ref., n. r. e. In that case the Court stated, "It is apparent from Hawkins' counsel's questions directed to his witnesses and the jury argument that his contention throughout the trial was that Hawkins' total incapacity was based on his inability to perform a job requiring him to bend, stoop and lift. This contention restricts the approved definition of total incapacity." Hawkins, a boiler maker, was injured October 4, 1960. He returned to work December 14, 1960, and worked almost continuously thereafter. The Court, in holding that the jury finding of total and permanent incapacity was against the great weight and preponderance of the evidence, said, "The evidence is clear Hawkins' condition did not, in the three years between the injury and second trial, prevent him from procuring and retaining regular, well-paying employment in *the same field* he was engaged in prior to the injury." (Italics ours.)

There is no similar showing in this case and the obviously correct holding of the Court in Hawkins, supra, is of no benefit to appellant here. It is not shown that appellee has done any work since his injury and there is little, if any, evidence that he will ever be able to do any work in his "field."

Appellant also cites Angelina Casualty Company v. Spencer, 310 S.W.2d 682, Tex.Civ.App., Beaumont, writ ref., n. r. e. The Court, in affirming a judgment for total incapacity for 300 weeks, stated, in overruling appellant's contention that there was no evidence to support this finding, that appellant "argues that if we allow such a verdict and judgment to stand, then we will be giving controlling effect to the bare conclusion of the appellee, a non-expert, and the equivocal opinion of appellee's sole medical witness that it was doubtful if appellee could do his *customary* work. We cannot agree with this contention. The question of duration of the incapacity of an injured person

can never be answered precisely. The injured party's own statements about how he got hurt, where he hurts at the time he was testifying and what he is able to do and what he is unable to do, can serve only as aid to the jury in making some reasonable, fair estimate of the term of disability. The opinions of medical experts have been held *not to be controlling* and can also be only a matter of aid to the jury in making their reasonable estimate of the term of disability." (Italics added.)

We fail to find anything in this case of comfort to appellant. It merely affirms the authority of the jury to make a fact finding on inconclusive evidence. There is no dearth of medical evidence here as to the nature and extent of appellee's injuries and the permanent effect they will have upon him in pursuing his "customary" work.

We overrule the points under consideration.

Points five through eleven are jointly briefed. They present, in various forms, the insufficiency of the evidence to support the jury finding that appellee sustained an injury which totally and permanently incapacitated him, and ask us to hold that such finding is against the great weight and preponderance of the evidence, is clearly wrong and should be set aside.

We refer to our statement of the evidence heretofore and hereafter made. Upon consideration of the entire record, we overrule points five through eleven. There is little, if any, evidence that appellee will ever be able to procure and retain employment in his "field," or that he will be able to procure and retain employment in pursuing his "customary" work, or that he will be able to procure and retain employment in doing the usual tasks of a workman. The evidence, in our opinion, is overwhelming to the contrary.

The twelfth point is that the trial court erred in overruling appellant's objection

to the testimony of Dr. Ross, given on cross examination, that appellee would be totally incapacitated if the usual and customary tasks of a workman required him to do those things which Dr. Ross had recommended that he not do. The question and the answer of Dr. Ross have been quoted above.[1] The objection of appellant was as follows:

"MR. DYE: Excuse me, doctor. Your Honor, may the record just reflect our objection to the assumption on the part of counsel as to what the definition of total and permanent incapacity is with respect to these specific things, because I believe the law is otherwise. The law simply speaks in terms of usual tasks of a workman so as to get and keep a job, but it is not restricted to jobs involving heavy lifting and bending and whatnot."

Appellant, on direct examination of Dr. Ross, had questioned Dr. Ross as shown below:

"Q In your opinion, Dr. Ross, you have had occasion to be familiar with various patients that have been connected with so-called workmen's compensation cases, of which this is one. In your opinion, doctor, is Mr. Washington so-called totally and permanently incapacitated from working?

A No, sir."

Appellant cites in support of this point the Hawkins case which we have discussed above and Texas Employers' Insurance Association v. Mallard, 143 Tex. 77, 182 S.W.2d 1000.

In Mallard the Court disapproved a definition of total incapacity in a charge which included the phrase, "in the usual occupation which he is suited to perform," saying, in part, "That unduly restricted the definition. An employee is not entitled to recover for total incapacity merely because he is unable to procure and retain

employment in his usual occupation. The term implies disability to perform the usual tasks of a workman and not merely the usual tasks of any particular one trade or occupation."

We are of the opinion that the question appellee propounded to Dr. Ross was fair cross examination since appellant had first obtained the opinion of Dr. Ross, in effect, that, under the Workmen's Compensation Law, appellee was not totally and permanently incapacitated from working. Appellee was entitled, we believe, to counteract the effect of this testimony by having Dr. Ross testify that appellee, in his opinion, was so incapacitated if, in the course of his work, he was required to do certain specified physical acts.

In the event we are in error in this holding, we are of the opinion that the error is harmless under Rule 434, Texas Rules of Civil Procedure. Dr. Ross had testified that he was not an expert in any field except medicine and that he was only qualified to express an opinion on appellee's physical limitations from a medical point of view. His opinions on job opportunities, employment practices and the law were, by his own admission, valueless. We do not believe that the jury was influenced by any opinion stated by the Doctor on such subjects. We overrule point twelve.

Points thirteen and fourteen are that the trial court erred in granting appellee leave to file a trial amendment amending his prayer to read, "that plaintiff have judgment against defendant for Workmen's Compensation at $35.00 per week for 401 weeks" in lieu of the former pleading that he recover such benefits for "400 weeks," for the reason that there was "no evidence in the record that any total incapacity of plaintiff would be permanent" and because "there was insufficient evidence that any total incapacity of plaintiff would be permanent."

1. Page 158.

We have held under other points that there was evidence and that it was "sufficient" to support findings that the total incapacity of appellee was permanent. We, therefore, overrule these points without further discussion.

Finding no error of a reversible nature, we affirm the judgment of the trial court.

Affirmed.